Good morning, Your Honors, and may it please the Court. My name is Kelly Noakes, appearing on behalf of Appellant's Western Watersheds Project and Wilderness Watch. I would like to reserve four minutes of my time for rebuttal, please. Mexican wolves were once on the brink of extinction, reduced to only seven individuals in the wild, in large part because of livestock grazing on federal lands and the resulting impacts and conflicts that this activity causes. Now, after a quarter century of conservation efforts and millions of dollars spent, wolves are finally beginning to recover across their historic southwest range. But despite this project, the Forest Service failed to consider, study, and disclose the impacts of authorizing livestock grazing in the exact location that the experts have designated as where these recovering wolves should live, roam, and reproduce, and where the population is now expanding back into. While the Forest Service recognized Mexican wolves would likely reoccupy this area, and indeed the wolves have since returned, the agency failed to consider any of the well-known impacts of grazing on wolves as the National Environmental Policy Act requires. When you talk about the area, are you speaking of the entire experimental project area, however many acres it is? It's a very large amount of territory covering most of Arizona, if not all of it? The Mexican wolf experimental population area does cover portions of New Mexico and Arizona. That does expand beyond the 270,000 acres that are at issue in this case. And the state land project at issue here relates to, I believe, 13 parcels that are a much smaller area. Is that correct? That is correct, Your Honor. However, all of the parcels that are at issue, all of the allotments at issue in this case, are located in Management Zone 1 of the recovery area. They are something like 3.5% of Management Area Zone 1? That is correct. It's about 3.5% of the experimental population area. So I think, for me, something that was very significant was the Forest Service finding that the wolves don't have dens in this particular area. All these sorts of things they look at as to whether the wolves are there. And they found that they are not. And that was a reason why they concluded that allowing grazing to continue in this area, as it has for decades, would not pose a significant threat to the wolves. I mean, so what is your response to that? In your brief, it seemed to be that, well, these activities have caused the loss of the wolves in the past. And so the Forest Service isn't sufficiently considering that. But they made specific findings about where the wolves are now, or where they were at the time of the study. Yes, Your Honor. While there were no known documented wolves on the allotments, with the exception of one allotment, the government did admit in the biological assessment that was prepared for this case that there was one known wolf-livestock interaction on the Alma Mesa allotment, which is farther to the north of the allotments at issue in this case. The population has been growing, which is great. We're excited that wolves are starting to recover. But with that comes the expansion of the population as well. And the Forest Service has admitted that it expected and anticipated wolves would be returning to these allotments at issue in this case. And then they had findings and recommendations in case there were encounters between livestock and the wolves. Is that correct? There are limited mitigation measures that were included in the government's analysis. However, the listing of mere mitigation measures alone is insufficient under this Court's precedent. The agency still needed to consider what the impacts that are being sought to be ameliorated by those mitigation measures are. And the agency failed to do that here. There's nowhere in the environmental assessment, in the ESA consultation documents that the agency points to that actually looks at the impacts to the Mexican wolves. Do you think that the Fish and Wildlife Service reports, which are incorporated by reference, I guess there's two issues. One, is that sufficient to incorporate them by reference? And two, do you think those documents address your concerns with the sufficiency of the findings? No, Your Honor. While the agency may look to Endangered Species Act consultations in a NEPA analysis to inform its analysis, here the documents that the agency points to are insufficient. First, the biological assessment that was prepared in this case was prepared for only two allotments, the Blackjack and Hickey allotments, which were further to the south of the project area. And in that document, the biological assessment notes that there was the wolf-livestock conflict on the Alma Mesa allotment, yet it still doesn't look at any of the impacts of grazing on Mexican wolves. But what happened in that encounter? Because I understand that no wolves were moved as a result. Essentially, nothing happened. No wolves were removed as a result of that livestock conflict situation. But it is evidence of the fact that conflicts can arise and that impacts could occur as a result of this activity in the heart of the Mexican wolves recovery area. I would also note that the streamlined consultation forms that the government points to also just reiterate the species status under the Endangered Species Act and, once again, don't include any impacts analysis. There's no discussion, no consideration of what the actual impacts to Mexican wolves are. And because Mexican wolves are listed as an experimental non-essential population, formal consultation was never required for Mexican wolves. So that's why the NEPA document here is so important. The NEPA document is where the government had the opportunity and the requirement to actually analyze the impacts of its action on this species, on the environment at issue here. I would like to point out additionally that the government relies on the no jeopardy finding throughout its briefing as far as the no jeopardy finding having significance. But the no jeopardy finding is not based on any analysis either. That no jeopardy finding is simply based on the species status as experimental non-essential and the status alone, which does not equate to an impacts analysis as NEPA requires. And this Court has held in Conservation Congress that the Forest Service can't conflate the Endangered Species Act and the National Environmental Policy Act. And it can't rely on any alleged compliance with the ESA as a substitute wholly for the NEPA compliance here. A no jeopardy finding does not mean that no impacts will occur. What impact do you think should have been identified and studied? The type of impacts that should have been considered are the impacts of conflict situations and the associated removals of Mexican wolves from the landscape. From an area where they were not known to inhabit? At the time of the decision. That's sort of what I'm getting to. You propose that the population could expand and the area occupied by these plots make up a small fraction of that area one. And so, yes, they could expand, but I'm not sure what conclusion that points to. That doesn't suggest there's going to be any further risk to them in the areas that they currently inhabited at that time. And the expansion could go into other parts not occupied by the Forest Service land in question here. So I'm not sure I really understand how a greater risk to that species exists as a result of this program. Well, Your Honor, the issue is the cumulative impacts on the species recovery potential overall. With every route, there's... But they've increased in numbers. So from 2015 to 2020, the wolf population increased. And the grazing that was allowed was at higher amounts than under the state line project. So I'm having a hard time reaching your conclusion that there's a risk to the entire species when the species has been increasing with higher amounts of grazing. That is correct that the grazing has been reduced in this project and the population has been expanding, has been growing. But with that growth comes the expansion of the population. It's notable that all of the allotments... Well, it may not expand as much as you would hope. I'm not sure I understand what threat is posed by that. I mean, why isn't identifying that, which is what I gleaned from looking at the documents, sufficient to conclude that the risk is not going to be greater under this project? This is the first NEPA analysis of grazing's impacts in this environment on these allotments ever. This is the first time the government is actually taking a look at this longstanding activity's impacts on Mexican wolves. And it failed to consider the cumulative impacts to the species' genetic health, for example. See, I hear you give me those words. I don't understand what they mean. If, as Judge Batey just pointed out, the population has been expanding, the grazing proposed under this project is reduced, I'm having trouble figuring out exactly what the threat is. The threat is to the species' recovery overall from livestock grazing. The types of impacts that the agency never considered were the impacts of removals on the species' genetic health or the impacts of prey displacement of the Mexican wolves' native prey by cows on the landscape. None of these issues were ever considered by the agency as it should have, as NEPA requires, in requiring the agency to take a direct look at it. You keep telling me what NEPA requires. I still don't understand what the real impact is. And I'll give up after this. But if the population is expanding and this project approves less grazing than before, exactly what's the threat? Well, Mexican wolves are one of the most critically imperiled species. They were derived from only seven founding members, and so their genetic health is in dire straits. One of the key threats to the species' recovery is the genetic health of the wild population. Mexican wolves are being reintroduced actively into this area. Zone 1 is the area of the recovery zone where releases will occur, where the animals are intended to and expected to and encouraged to live, survive, reproduce, and roam. The Mexican wolf experimental population area is geographically limited to south of I-40. And so this is the key area where the experts have determined that Mexican wolves are being encouraged to be reintroduced into. So I-40 runs across the top of the state, right? That's correct. So if it's limited to south of I-40, you're essentially saying it's limited to seven-eighths of Arizona. I mean, that's a huge amount of territory. And if only 3.5 percent of Zone 1 is where the wolves are being introduced, that means like 96.5 percent of that zone has no impact whatsoever. The wolves can be—there's no grazing. It's not going to be an impact. But that's incorrect, because there is grazing. The state-line decision at issue here only covers these 14 allotments as part of the state-line grazing project. However, livestock grazing occurs elsewhere throughout the Mexican wolf experimental population area, elsewhere on the two national forests that are at issue here in the Apache Sick Greaves and the Gila National Forest. The Forest Service has limited this project decision to the 14 allotments that are at issue in this case. But that does not mean that grazing doesn't occur elsewhere throughout the Mexican wolves recovery area. And that's the key issue here. The fact that the cumulative impacts of removals here on the 14 state-line allotments could add up to something more when you look at the cumulative impacts of grazing elsewhere in the species habitat and in combination with the illegal killing of Mexican wolves or prey displacement impacts. These are all the types of impacts that the government just failed to consider in this first-ever NEPA analysis of grazing's impacts on Mexican wolves in the heart of their recovery zone here. So there are two other findings in the district court's decision with respect to whether the project's potential effect on the Blue Range primitive area and on inventory roadless areas. And I did not see any challenge in your briefs to those findings. Have you abandoned that challenge on appeal? We have included the significance factors analysis for our argument that an environmental impact statement was required. We point to the unique characteristics of the geographic area of the state-line project, including the wilderness areas at issue, the Blue Range primitive area, which is managed as wilderness, as well as the inventory roadless areas that are at issue to help describe the unique ecological characteristics of this project to point to one of the significance factors that shows that EIS was warranted in this case. Okay. So I didn't see any argument in your brief about the district court's findings on those two areas. You're saying it's there because it's discussed in background? It's discussed in the environmental impact statement required section of the brief at the very end. Our argument that an environmental impact statement was required is based on the significance factors of adverse impacts to listed species, such as Mexican wolves, and the fact that unique characteristics, including the project area's role as an ecologically critical area for Mexican wolves, and the unique characteristics of the wilderness lands that are at stake, the wilderness resources, and the roadless area resources here, warrant preparation of an environmental impact statement. And would an EIS have to cover more than just the allotments at issue that are at issue here? No, Your Honor. I believe that an environmental impact statement that analyzes, that takes a direct, a hard look at the impacts of grazing on these 14 allotments would be sufficient to support the decision notices for grazing on these 14 allotments. Because I heard, I thought in your answer to Judges Beatty and Clifton, I thought that we were going to have to consider sort of the impact on grazing outside of those allotments. That could be considered as part of the cumulative impacts of grazing on Mexican wolves. Grazing does occur outside of these 14 allotments. So does the EIS have to deal with grazing generally, or does it just have to deal with grazing on the 14 allotments at issue here? Well, I think it's tied to the cumulative impacts. When you're looking at the impacts of grazing on these 14 allotments, you should consider the cumulative impacts of grazing on the species overall. Grazing has impacts that stretch farther than the bounds of this project area. Unless Your Honors have no further questions, I'll save my remaining time for rebuttal. Thank you. Thank you. Good morning, and may it please the Court. Kyle Glynn appearing on behalf of the Forest Service. Your Honors, I'll start with plaintiffs' claim that the Forest Service failed to take a hard look at potential wolf impacts before turning to their related claim that environmental impact statement was required here. On the hard look claim, the ultimate question here is simply one of reasonableness. It's whether the agency undertook a reasonably thorough analysis of the action's likely environmental impacts. In the environmental assessment of informed readers that the analysis of potential wolf impacts here was shaped by the agency's consultation with the Fish and Wildlife Service. That fish and wildlife, I mean, those consultations revealed a number of basic facts that plaintiffs have not disputed here today or at any point during this litigation. On 13 of the active grazing allotments, there's no wolf dens, no wolf packs, no territory, no rendezvous site. The one allotment that's within the wolf's occupied range at the time of the decision was the Alma Mesa allotment. And despite grazing occurring on that allotment at the same amount as what the project reauthorized, there was only one conflict in early 2018. And that one conflict did not lead to any wolf removal. Removals of wolves from the wild being the chief impact that plaintiffs have said that the Forest Service failed to take a hard look at. So plaintiffs have offered no explanation why in light of these background facts, or they point to nothing in the administrative record that indicates that future removals of wolves from the wild are likely to result from grazing on these allotments. Moreover, as to the point about Zone 1 being a critical area where the wolf is primarily reintroduced, there's nothing in either the 1998 or the 2015 10-J rule from the Fish and Wildlife Service that says that this part of the project area allotments within Zone 1 or that Zone 1 generally is the sort of wolf sanctuary that plaintiffs have suggested it is. Reintroduction of wolves into this area is predicated on wolves adapting to current land uses like livestock grazing. On the issue of the agency relying on fact findings made during the Endangered Species Act consultations, as we discussed in our brief, this Court has already squarely rejected in Environmental Protection Information Center and Francis Santa Clara River that NEPA requires an agency to ignore findings made as part of its Endangered Species Act analysis. It is certainly reasonable to keep, or it was certainly reasonable for the Forest Service to keep the environmental assessments discussion of potential wolf impacts brief in light of what the consultations here revealed. To the extent that it's been suggested here today that the consultation information should be cast aside because the findings here were not made as part of a formal consultation, we acknowledge that in Environmental Protection Information Center there was a formal consultation, but this Court had noted that the agency didn't rely just on a biological opinion, but also on numerous other sources of information like a biological assessment, and although the biological assessment here was primarily prepared to assess impacts on other species, it did discuss the Mexican gray wolf. Moreover, in Francis Santa Clara River, which upheld an environmental assessment that relied in part on findings made under the Endangered Species Act, there was no formal consultation at all in that case. In fact, there was an Endangered Species Act claim, independent from a NEPA claim, that the agency was required to formally consult the National Marines Fishery Service. So there's nothing that supports, you know, casting aside the Endangered Species Act findings here because they were not prepared as part of a formal consultation. What is the significance of the wolf's status as an experimental non-essential population? Is it the government's position that because this area is deemed non-essential that the Forest Service didn't have any duty under NEPA to analyze the project's effects on this subspecies? No, Your Honor, that is not our position here. If the Forest Service simply noted that the wolf was a non-essential population and stopped its NEPA analysis at that and didn't look at anything else, we acknowledge that would be a problem. But there is much more here to the Forest Service noting that the wolf was a non-essential population and that this action was not likely to jeopardize it. And this gets into the next point I wanted to make about these informal consultation forms. These forms were detailed and not conclusory as plaintiffs have suggested. The Forest Service and Fish and Wildlife Service, as discussed in the Fish and Wildlife Service's concurrence letters, had a two-day meeting where they discussed information to put in these forms. There was a lot of back and forth over email and phone over the information to put in these forms. And the Forest Service actually made changes to these forms based on information that it learned in consultation with the Fish and Wildlife Service. These forms also noted that there were ground-level survey efforts, trapping and identification efforts on each allotment to identify potential wolf presence and found none except for, again, the Yalma Mesa allotment being the only one within the wolf's occupied range. But I think that Plaintiff's point is that the reason there are no wolves or very few wolves is because of historic activities, human activities, grazing. And so the fact that these 14 allotments, there's no evidence of wolf presence, that's the result of these historical impacts. And so the Forest Service should have gone beyond the absence of the perhaps after they had an impact statement. Well, Your Honor, I do believe that the Forest Service here went beyond merely looking at the absence of wolves on certain allotments. In the biological assessment, it accounted for how, on the Yalma Mesa allotment, wolves, there were reports of uncolored wolves on that allotment. And it accounted for how, because that allotment is not far from the Blackjack and Hickey allotments, there's a potential for wolves to travel onto those allotments. However, it reasonably found that any impacts from livestock interaction would be minimal, considering that grazing had been ongoing for the past several decades and had not led to any removals of wolves from the wild. I'd like to turn to Plaintiff's point, relatively, on the cumulative impacts claim. The only argument that's really been developed here on cumulative impacts is Plaintiff's argument regarding genetic threats to the wolf. And it's not just genetic threats to the wolf in the abstract, it's genetic threats resulting from removals of wolves from the wild. But again, the Forest Service took a hard look and reasonably found that removals of wolves from the wild were not likely to result from ongoing grazing on these allotments. And, in fact, it adopted a number of measures short of wolf removal that it could implement to avoid exacerbating that risk. So in light of the fact that there was nothing indicating that wolf removals were likely, it's unclear why the environmental assessment, which is a document, of course, by its nature, that's intended to be a concise explanation of why the agency is finding no significant impact, had to engage in this tangential effect or this tangential discussion of potential genetic threats to the wolf. Indeed, as has been discussed today, the wolf's population has been increasing. There's been an increase in the wolf population over each of the past eight years with record numbers of pups and breeding pairs in the wild. So there simply is nothing in the record that indicates that there's been a spillover effect from grazing on these allotments that might impact wolves in other allotments. How frequently does the Forest Service conduct this sort of assessment? So the government's position is now the wolves are increasing and we didn't see a threat to them by allowing this project. When do you reassess that? What if it starts to have an impact on the wolves? How would you know? Your Honor, well, the project has ongoing monitoring built into it and as the grazing consultation forms note, permittees have a responsibility to report wolf-livestock interactions. If wolf depredation on livestock becomes a significant issue, which the record at the decision indicated it would not be, then both the Endangered Species Act regulations and NEPA require the Forest Service to take that information into account and potentially prepare a supplemental NEPA analysis or reconsult with the Fish and Wildlife Service. But plaintiffs have not made any assertion that since the project has been authorized that these wolf issues have, or any wolf issues have arisen, or that any supplementation was necessary. The decision notices were each issued in late 2019 and early 2020 and authorized immediate implementation. So grazing has been ongoing under the project for the past five years. On the hard look claim, once you remove the premise that the Forest Service was unable to rely on its findings made as part of the Endangered Species Act consultation, the rest of their hard look claim sort of falls apart. Again, the Forest Service recently found that there's no significant likelihood of wolf removal from conflicts on these allotments and because the genetic threats claim is tied to wolf removal specifically, which the Forest Service found was not likely to happen, it's unclear, again, why the Forest Service had to engage in any discussion of genetic threats. Plaintiffs made a brief mention of their prey displacement theory. We believe that theory is both waived and forfeited for the reasons we explained in our briefing. But in any event, the environmental assessment and the terrestrial wildlife report that had been incorporated by reference discussed potential prey impacts at length. Turning away from the hard look claim to the environmental impact statement claim, plaintiffs' arguments on this point largely as to the wolf, largely repeat their hard look points. And I would like to briefly note regarding Judge Bybee's question about an environmental impact statement as to other allotments, the Fish and Wildlife Service has already conducted two environmental impact statements in conjunction with each 10-J rule, both in 1998 and in 2015. In both of those analyses, the Fish and Wildlife Service determined that livestock grazing on lands throughout the experimental population area was not likely to significantly impact the wolf. So it's unclear why the Forest Service had to re-engage in that same analysis here when it recently found that wolf removals or conflicts were not likely to result. So why do we consider the Fish and Wildlife Service reports? Is it because they're incorporated in the Forest Service findings of no significant impact? Do we consider...another one of the points is do we consider responses to the public comments? What all gets scooped into the environmental assessment? Well, Your Honor, the Fish and Wildlife Service or the Forest Service, of course, looked to the 10-J rules in conducting its NEPA analysis. I do think that the court can look to the public comments as well. And of course, I think it's important to note that the public comments read the environmental assessment here, as the district court read it, as saying wolves have not yet established a presence in the project area. I'll turn briefly to plaintiff's remaining claim regarding the special management areas on this point. Their briefing does talk about special management areas, but at the same time, it simply points out that the project area overlaps these areas. The Forest Service discussed rowless areas, wilderness areas, wilderness study areas that lengthen the environmental assessment and a number of reports that it incorporated by reference and found that any impacts to these areas would be minimal. And plaintiffs have really...plaintiffs have not shown that that determination about minimal impacts was arbitrary and capricious. So did...help me remember the chronology here. Did...were wolves reintroduced in 1998, or was it earlier than that? There were 11 wolves, I believe, introduced in 1998, and that was the first reintroduction. So by 2019, we're up to over 100. And I think that's a pretty good number. And they haven't gone to these particular allotments, or at least 12 of the 13. I guess I'm trying to understand plaintiff's point that the reason they're not there is because this species has been decimated, and they're not going there because grazing is there, and that maybe if the grazing weren't there, the wolves would move in. That may not be an accurate assessment of their position, but how would you respond to that? Your Honor, again, I would point to the Ama Mesa allotment where, you know, grazing was ongoing, I believe, at a level of 8,400 animal unit months, which is the same level that the project reauthorized. And it did not preclude occupancy of that allotment by the wolf. So in light of that determination, the Forest Service recently found that on the other allotments, and especially with the mitigation measures that the Forest Service might implement, that grazing on those allotments would not preclude occupancy of the wolf if they moved on to them. If the Court has no further questions, we would ask that the discourse just be affirmed. Thank you. Thank you, Your Honors. Just a few points in rebuttal to a few points that came up in the government's argument. First, wolves were expected to be on these allotments, and indeed, that's the whole point of the recovery project underway. Wolves need to be restored to their historic habitat, and this is the core of their recovery zone. And as Your Honor has recognized, it's because of this activity that... I'm sorry, is the recovery zone, is that just zone one? Are we talking about all three zones? There's three zones that are included in the Mexican Wolf Experimental Population Area. Right. Again, and that's going to be three-quarters of Arizona and New Mexico. That's correct, Your Honor. Okay. To the point about, to your final point that you raised, grazing and wolves can coexist, but that doesn't mean that impacts do not need to be considered under NEPA. We shouldn't have to wait until something goes wrong to consider what the impacts of this action is going to be on this species. NEPA requires that hard look and is forward-looking to look at what are the impacts of this action going to be over the course of the lifetime of this project. This project authorizes grazing for ten years moving forward. Ten years where hopefully the wolves are going to continue to grow in their population and continue to expand back into their historic habitats. So are we five years into the ten years at this point? Just about. That's correct. And are there any indications that the project is harming the subspecies? There's indications that if you look at the most recent occupancy maps, Mexican wolves are returning to this area. All 14 allotments at issue, all 13 allotments at issue in this case, are now part of the occupied range of Mexican wolves. And so the wolves are starting to make a comeback. But the fact that an activity is allowed just because grazing is allowed doesn't mean that we don't need to consider the impacts of that activity on the environmental resources. And that's what we're asking the Forest Service to do here is to actually take a look at what kind of impacts grazing may have on this species so that we can make sure that wolves are given the space to recover as they're being intended to do as we're spending the money to do so as the government is intending to recover this species in the wild. I would also like to note that the government, we're not asking for the consultation documents to be set aside, but if you actually look at the consultation documents at issue here, the streamlined consultation forms and the biological assessment, there is no analysis of the impacts to Mexican wolves. And if you look at the mitigation measures that are included, most of those mitigation measures are actually mitigating the impacts to the livestock as opposed to the Mexican wolves. We're asking the agency to actually look at and actually consider what are the impacts of grazing on Mexican wolves and the species recovery here. Also, the significance of the population status as experimental, non-essential, and your Honor's question about that, I would encourage the government to consider that this is, or your Honor's to consider that the experimental population is one of the most critically endangered species. Just because they are experimental does not mean they are no longer fully endangered. If you look at the terrestrial wildlife report that was included that the government points to as informing its NEPA analysis, there is more argument arguably for the Davidson Cliff carrot as opposed to Mexican wolves in that report. Mexican wolves are not even mentioned. And at least the government acknowledges that the Cliff carrot is on steep habitat, very steep habitat where cows won't be to have no impacts, whereas Mexican wolves were never considered with that level of analysis here. Finally, just in closing, I would just encourage the government or your Honor's to consider that NEPA is what the relevant law that is at issue here. A significant, plaintiffs have met their burden that substantial questions are at least raised that significant impacts may occur to Mexican wolves warranting an EIS. Thank you. Thank you. Counsel, thank you for your arguments this morning. They were very helpful. And we are in recess until tomorrow morning. All rise.
judges: CLIFTON, BYBEE, BADE